UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE MAGNOLIA FLEET

CIVIL ACTION

NO: 16-12297

SECTION: "H"(1)

## ORDER AND REASONS

Before the Court is Claimant Jeffrey Jenkins's Motion to Dismiss (Doc. 39); Limitation Petitioners' Motion for Summary Judgment on Claimant Jeffrey Jenkins's punitive damages claim (Doc. 100); and Claimant Jeffrey Jenkins's Motion for Summary Judgment on Limitation of Liability (Doc. 97). For the following reasons, the Motions are DENIED.

## BACKGROUND

This action arises out of an incident in which the M/V PINTAIL capsized, allegedly causing the death of a River Construction Inc. ("River Construction") operator, James D. Swafford, and injuring a River Construction welder, Jeffrey Jenkins. The incident occurred on December 30, 2015 when the PINTAIL's motor stalled while it was being operated on the Mississippi River by River

1

Construction employees. On June 30, 2016, Magnolia Fleet, L.L.C. ("Magnolia Fleet"), as Owner, and River Construction, as Operator, of the M/V PINTAIL (collectively, "Petitioners") filed a Complaint for Exoneration or Limitation of Liability. On July 12, 2016, this Court issued a stay of the prosecution of any proceedings outside of the limitation action. Claimants Carla Guileyardo, Jeffrey Jenkins, American Longshore Mutual Association, Ltd., and Carl Swafford answered with claims in this matter. The claims of Carla Guileyardo have been settled, and the claims of Carl Swafford have been dismissed.

Now before the Court are three motions. In the first, Claimant Jeffrey Jenkins has adopted a Motion by former Claimant Carla Guileyardo, arguing that River Construction is not entitled to limitation of liability because it is not an owner of the PINTAIL. In the second Motion, Petitioners seek dismissal of Claimant Jenkins's claim for punitive damages. Petitioners allege that notwithstanding Jenkins's classification as a seaman or longshoreman, he cannot succeed in his claim for punitive damages. In the third, Jenkins argues that Petitioners are not entitled to limitation of liability. This Court will consider each Motion in turn.

## LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[1] A genuine issue

---

[1] Sherman v. Hallbauer, 455 F.2d 1236, 1241 (5th Cir. 1972).

of fact exists only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[2]

In determining whether the movant is entitled to summary judgment, the Court views facts in the light most favorable to the non-movant and draws all reasonable inferences in his favor.[3] "If the moving party meets the initial burden of showing that there is no genuine issue of material fact, the burden shifts to the non-moving party to produce evidence or designate specific facts showing the existence of a genuine issue for trial."[4] Summary judgment is appropriate if the non-movant "fails to make a showing sufficient to establish the existence of an element essential to that party's case."[5] "In response to a properly supported motion for summary judgment, the non-movant must identify specific evidence in the record and articulate the manner in which that evidence supports that party's claim, and such evidence must be sufficient to sustain a finding in favor of the non-movant on all issues as to which the non-movant would bear the burden of proof at trial."[6] "We do not . . . in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts."[7] Additionally, "[t]he mere argued existence of a factual dispute will not defeat an otherwise properly supported motion."[8]

---

[2] Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).
[3] Coleman v. Houston Indep. Sch. Dist., 113 F.3d 528, 532 (5th Cir. 1997).
[4] Engstrom v. First Nat'l Bank of Eagle Lake, 47 F.3d 1459, 1462 (5th Cir. 1995).
[5] Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).
[6] John v. Deep E. Tex. Reg. Narcotics Trafficking Task Force, 379 F.3d 293, 301 (5th Cir. 2004) (internal citations omitted).
[7] Badon v. R J R Nabisco, Inc., 224 F.3d 382, 394 (5th Cir. 2000) (quoting Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994)).
[8] Boudreaux v. Banctec, Inc., 366 F. Supp. 2d 425, 430 (E.D. La. 2005).

## LAW AND ANALYSIS

### I. Jenkins's Motion to Dismiss

Guileyardo filed a Motion to Dismiss, or alternatively for Summary Judgment, arguing that River Construction is not the owner, owner *pro hac vice*, or bareboat charterer of the M/V PINTAIL and therefore should not be entitled to seek limitation of liability. Jenkins subsequently adopted this Motion as his own. Despite styling this Motion as a motion to dismiss, both parties have attached evidence outside the pleadings, which this Court has chosen not to exclude. Accordingly, the Motion is converted to a summary judgment motion.[9] River Construction had ample opportunity to respond and present evidence as demonstrated by the exhibits attached to its opposition.

In this Motion, Jenkins argues that River Construction did not have the ownership or control over the M/V PINTAIL required under the Limitation of Liability Act. He points out that River Construction's Complaint for Limitation alleges only that it was the operator of the PINTAIL. River Construction argues that it was an owner *pro hac vice* of the PINTAIL and is therefore entitled to limitation of liability.

The Limitation of Liability Act provides that "the liability of the owner of a vessel for any claim, debt, or liability described in subsection (b) shall not exceed the value of the vessel and pending freight."[10] An "owner" is defined as including "a charterer that mans, supplies, and navigates a vessel at the

---

[9] See Fed. R. Civ. P. 12(d).
[10] 46 U.S.C. § 30505.

4

charterer's own expense or by the charterer's own procurement."[11] "Courts have expanded the definition of owner or charterer to encompass parties in analogous situations who exercise dominion and control over a vessel and are therefore owners *pro hac vice* even if not technically charterers."[12] Courts have held that:

> [A]n "owner" for the purposes of limitation of liability is one who is subjected to a shipowner's liability because of his exercises of dominion over [i.e., relationship to] the vessel. In other words, an operator with significant management and operational control over a vessel may seek exoneration from or limitation of liability when it acts as a manager of the vessel or acquires work for and dispatches the vessel.[13]

The parties dispute whether River Construction's had the requisite management and operational control over the M/V PINTAIL to claim limitation of liability.

River Construction is wholly owned by its president, William Wiedner, III. Magnolia Fleet is owned by William Wiedner, III; his father, William Wiedner, IV; and John Stewart. William Wiedner, IV is the president of Magnolia Fleet. The M/V PINTAIL was typically moored on a dock owned by Magnolia Fleet on the west bank of the Mississippi River. River Construction kept several barges on the east bank of the river and used the Magnolia Fleet facility to access those barges. River Construction employees frequently used the PINTAIL to cross to the east bank of the river. The parties testified that there was no written or oral agreement between Magnolia Fleet and River

---

[11] *Id*. § 30501.
[12] In re Am. Milling Co., Ltd., 409 F.3d 1005, 1014 (8th Cir. 2005).
[13] In re Ingram Barge Co., No. 05-4419, 2007 WL 2088369, at *3 (E.D. La. July 19, 2007).

Construction regarding use of the PINTAIL, but the companies had an informal, unspoken understanding regarding its use. River Construction had unlimited access to the PINTAIL with no requirement that it ask permission from Magnolia Fleet to use the vessel. Indeed, the keys were stored under the seat. An employee of River Construction testified that he operated the PINTAIL on a daily basis. When it was operating the PINTAIL, River Construction used its own crew and was often performing work for its own customers. River Construction, however, did not make any formal payment for its use of the PINTAIL. Instead, the companies "enjoyed a reciprocal exchange of equipment and services for the mutual benefit of both companies."[14] River Construction did not pay for the vessel's gas, maintenance, or repairs. In addition, Magnolia Fleet still had access to and use of the vessel, and it trained the River Construction employees on operation on the vessel.

By all accounts, the relationship between River Construction, Magnolia Fleet, and the PINTAIL is an unusual one. The relationship between the parties for the use of the PINTAIL cannot be classified as a traditional charter party agreement.[15] This Court finds the question of whether River

---

[14] Doc. 63.
[15] "There are three generally recognized types of charter parties: the first two, the 'voyage charter' and the 'time charter,' occur when the vessel is manned and navigated by the owner. In the voyage charter the ship is engaged to carry a full cargo on a single voyage, whereas in the time charter the charterer engages the ship to carry cargo over a fixed period of time. The third charter is known as a 'bareboat' or 'demise charter.' In this arrangement, the charterer operates the ship and is regarded as the owner of the ship pro hac vice." Int'l Marine Towing, Inc. v. S. Leasing Partners, Ltd., 722 F.2d 126, 130 (5th Cir. 1983). "To create a demise the owner of the vessel must completely and exclusively relinquish 'possession, command, and navigation' thereof to the demisee." Guzman v. Pichirilo, 369 U.S. 698, 699 (1962).

Construction had the requisite dominion over the PINTAIL to entitle it to limitation of liability to be a difficult question of fact. In resolving such a question, Courts consider a myriad of factors, including who mans, crews, and navigates the vessel; who is responsible for maintenance and repairs; who is responsible for training, selecting, and paying the crew; whether the borrowing party provided insurance; who is in possession and control of the vessel; the borrowing party's autonomy from the actual owner; who has the ultimate authority over decision making; and who makes daily navigational decisions.[16] This Court finds that there is insufficient information before it at this summary judgment stage to conduct a full factual analysis. Such a determination is best made after a trial. Accordingly, Jenkins's motion is denied.

## II. Petitioners' Motion for Summary Judgment

Next, Petitioners argue that notwithstanding whether Jenkins is ultimately classified as a seaman or a longshoreman, he cannot succeed on a claim for punitive damages under general maritime law. Jenkins concedes that if he is classified as a seaman he cannot, as a matter of law, bring a claim for punitive damages against his employer River Construction. Jenkins also recognizes that pursuant to *McBride v. Estis Well Services, LLC*, he would not, as a seaman, have a claim for punitive damages based on his unseaworthiness claim against Magnolia Fleet.[17] Accordingly, Jenkins may only bring a punitive

---

[16] *See In re Am. Milling Co., Ltd.*, 409 F.3d at 1014; In re M/V Seaboard Spirit, No. 11-23841, 2014 WL 3673323, at *2 (S.D. Fla. July 23, 2014).

[17] McBride v. Estis Well Serv., L.L.C., 768 F.3d 382, 391 (5th Cir. 2014) ("[I]n a wrongful death case under the Jones Act and the general maritime law, [the Supreme Court]

damages claim if he is ultimately classified as a longshoreman. Petitioners argue though that even if Jenkins is a longshoreman, he cannot prove his claim for punitive damages under general maritime law.

In order to succeed on a claim for punitive damages under the general maritime law, Jenkins must show "that the defendant engaged in behavior that is more than merely negligent."[18] Indeed, the behavior must rise to the level of gross negligence, "reckless or callous disregard for the rights of others," or "actual malice or criminal indifference."[19] "[P]unitives are aimed not at compensation but principally at retribution and deterring harmful conduct."[20] Petitioners assert that Jenkins cannot show that their conduct rose to this level.

Petitioners allege that the evidence shows that they did not act recklessly either in the maintenance of the M/V PINTAIL or in the training of its crew. They show that the motor on the PINTAIL was serviced just two weeks prior to the accident at issue and that no problems were noted. They argue that there is no evidence that they had any prior knowledge of any motor stalling issues. They point out that Jenkins and Swafford experienced the motor of the PINTAIL stalling the day prior to the accident but failed to report this to anyone. In addition, they note that another vessel was always available for their use. They allege that the operators of the PINTAIL were experienced

---

has limited the survivor's recovery to pecuniary losses."); Melancon v. Gaubert Oil Co., Inc., No. CV 17-2905, 2017 WL 3438346, at *3 (E.D. La. Aug. 10, 2017) (and cases cited therein).

[18] Hancock v. Higman Barge Lines, Inc., No. 16-14998, 2017 WL 3582433, at *4 (E.D. La. Aug. 18, 2017).

[19] *Id.*

[20] Exxon Shipping Co. v. Baker, 554 U.S. 471, 492 (2008).

operators who were submitted to a "reasonable training program." In addition, the PINTAIL was 22 feet long and therefore not required to be operated exclusively by a licensed vessel captain according to Coast Guard regulations.

By contrast, Jenkins alleges that Petitioners failed to train the operators of the PINTAIL, failed to create written policies or procedures for safe operations, and knew the PINTAIL had experienced motor problems. Jenkins puts forth testimony from Magnolia Fleet's President that the only training given to operators of the PINTAIL was a five to ten minute "little rundown." He also points out that while Miller was a boat owner and experienced in operating vessels, he unequivocally testified that he had never operated his personal boats in the Mississippi River. It is undisputed that the river was high and fast moving on the day of the accident.

Jenkins also puts forth maintenance and repair records indicating that the PINTAIL did in fact have trouble with and work performed on the engine. A repair record from November 1, 2015 states that "Engine/Boat Sank." Shortly thereafter on December 11, 2015, a repair record indicates that the "Engine Will Not Spin Over." Jenkins argues that despite this knowledge (and the motor failures of other vessels in their fleets), Petitioners did nothing to train their crews on what to do if they experienced a motor failure while on the river.

Petitioners do much to dispute the facts set forth by Jenkins, but these arguments only further establish the issues of fact that abound in this motion. Accepting Jenkins facts as true, this Court does not find it implausible that Petitioners may have acted recklessly. Petitioners allowed a 22-foot vessel with prior engine problems to be operated in high river conditions by an

operator with minimal training. This Court is not prepared to rule that such conduct cannot rise to the level of gross negligence. Such a finding is best left to trial.[21] Accordingly, Petitioners' Motion is denied.

### III. Jenkins's Motion for Summary Judgment

Finally, Jenkins has moved for summary judgment arguing that Petitioners should be precluded from exoneration or limitation of liability. He argues that Petitioners "were negligent, the M/V PINTAIL was unseaworthy, said negligence and unseaworthiness legally and proximately caused personal injuries to Claimant as well as the death of Mr. James Swafford, and River Construction, Inc. and Magnolia Fleet, LLC both had privity and knowledge of their respective negligence and/or unseaworthiness of the M/V PINTAIL."

The determination of entitlement to limitation of liability is a two-step process. "First, the court must determine what acts of negligence or conditions of unseaworthiness caused the accident. Second, the court must determine whether the shipowner had knowledge or privity of those same acts of negligence of conditions of unseaworthiness."[22]

As to the first prong, Jenkins argues that Petitioners were negligent in failing to properly train the PINTAIL's operators or provide any safety policies pertaining to the operation of the PINTAIL and that this negligence caused the accident. Petitioners disagree, arguing that the training program provided to their operators was reasonable and that Jenkins caused the accident by failing to report issues encountered in the operation of the PINTAIL on the day

---

[21] *See* Shore Expl. & Prod. Corp. v. Exxon Corp., No. 3-95-CV-1228-R, 1998 WL 641811, at *1 (N.D. Tex. Sept. 15, 1998) ("Gross negligence is typically a question of fact and therefore not well-suited for summary judgment.").

[22] Farrell Lines Inc. v. Jones, 530 F.2d 7, 10 (5th Cir. 1976).

prior to the accident. "'[Q]uestions of adequacy and competency are questions of fact,' which cannot be resolved on summary judgment."[23] In addition, causation is a question of fact, which is generally decided at a trial on the merits.[24] Genuine issues of material fact regarding the adequacy of training, the causation of the accident, and even Jenkins's seaman status abound in this Motion. Accordingly, resolution of these issues on summary judgment would be inappropriate. Jenkins's Motion is denied.

## **CONCLUSION**

For the foregoing reasons, the Motions are DENIED.

New Orleans, Louisiana this 19th day of October, 2017.

_____
**JANE TRICHE MILAZZO**
**UNITED STATES DISTRICT JUDGE**

---

[23] Howard v. Offshore Liftboats, LLC, No. 13-4811, 2016 WL 74448, at *2 (E.D. La. Jan. 6, 2016) (quoting Dillon v. M. S. Oriental Inventor, 426 F.2d 977, 979 (5th Cir. 1970)).
[24] Skipper v. United States, 1 F.3d 349, 352 (5th Cir. 1993); Arceneaux v. State Farm Fire & Cas. Co., No. 07-3830, 2009 WL 1393711, at *3 (E.D. La. May 18, 2009).